# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEITH ROMOND CHARLESTON,

Defendant-Appellant.

UNPUBLISHED
March 12, 2015

No. 316771
Wayne Circuit Court
LC No. 13-000342-FC

Before: MARKEY, P.J., AND MURRAY AND BORRELLO, JJ.

PER CURIAM.

Defendant appeals by right his convictions after a jury trial of first-degree premeditated murder, MCL 750.316(1)(a), possession of a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to life in prison without parole for his first-degree premeditated murder conviction, three to five years' imprisonment for his felon-in-possession conviction, and two years' imprisonment for his felony-firearm conviction. We affirm.

This case arises from the murder of Charles Wall in Detroit, Michigan. Defendant first argues that he did not waive his *Miranda* rights[1] knowingly and intelligently. We disagree.

A defendant preserves the issue of whether he knowingly, intelligently, and voluntarily waived his *Miranda* rights by filing a pretrial motion to suppress his statement to the police. See *People v Henry (After Remand)*, 305 Mich App 127, 144; 854 NW2d 114 (2014). Defendant filed a motion to suppress the statement he made to the police, but he only argued that his statement to the police was involuntary. On appeal, defendant argues that his waiver of his *Miranda* rights was not knowing and intelligent. The issue of whether a defendant voluntarily confessed to a crime is separate from the issue of whether a defendant knowingly, intelligently,

---

[1] These are Fifth Amendment rights the Supreme Court's decision in *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966) was intended to protect.

and voluntarily waived his *Miranda* rights although the analysis for determining voluntariness of a *Miranda* waiver is essentially the same. See *People v Ryan*, 295 Mich App 388, 396-397; 819 NW2d 55 (2012). Consequently, the issue of whether defendant knowingly and intelligently waived his *Miranda* rights is unpreserved. See *Henry (After Remand)*, 305 Mich App at 144.

Because defendant failed to preserve the issue of whether he knowingly and intelligently waived his *Miranda* rights, we review the unpreserved claim of constitutional error for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To prevail, defendant must show: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. With regard to the last element, defendant must show that the error affected the outcome in the trial court. *Id*. Moreover, plain error warrants reversal only if it results in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of judicial proceedings regardless of the defendant's guilt or innocence. *Id*. at 763.

A defendant has a constitutional right to remain silent during custodial interrogation. *Henry (After Remand)*, 305 Mich App at 145. Thus, statements made by a defendant during custodial interrogation are inadmissible at trial unless the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). This Court will conduct a bifurcated analysis and will examine whether the defendant waived his *Miranda* rights (1) knowingly and intelligently and (2) voluntarily. *Id*. "Intoxication from alcohol or other substances can affect the validity of a waiver of Fifth Amendment rights, but is not dispositive." *Id*. With regard to whether a defendant's waiver of his *Miranda* rights was knowing and intelligent, a court will examine the defendant's level of understanding of the waiver. *People v Gipson*, 287 Mich App 261, 265; 787 NW2d 126 (2010). "A defendant does not need to understand the consequences and ramifications of waiving his or her rights." *Id*.

In reviewing whether a defendant voluntarily confessed to a crime, this Court examines the totality of the circumstances and determines whether "the confession is 'the product of an essentially free and unconstrained choice by its maker,' or whether the accused's 'will has been overborne and his capacity for self-determination critically impaired.' " *Ryan*, 295 Mich App at 396-397 (citation omitted). In determining voluntariness, factors to consider include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

A *Walker*[2] hearing was held on defendant's motion to suppress on February 22, 2013. Detroit Police Officer Derrick Maye testified that he interviewed defendant on December 26, 2012, at approximately 8:00 p.m. Defendant was not deprived of any food or water, and defendant had a carton of juice with him during the interview. Officer Maye explained that the Second Precinct where the interview occurred had scheduled feeding times. The scheduled feeding time on that day was 6:00 p.m. Defendant did not tell Officer Maye that he was hungry during the interview. Defendant was 29 years old at the time of the interview and had completed the ninth grade. Officer Maye provided defendant with a notice of constitutional rights form, read the form aloud to defendant, and gave defendant the opportunity to read it himself. Defendant did not slur his speech. Defendant did not appear to be drunk or tired. His eyes were not bloodshot. Defendant also did not appear confused or disoriented. Defendant was coherent and was able to understand the conversation. During the interview, defendant told Officer Maye that he was living in Atlanta at the time of the incident. Defendant eventually stated that he lived on the street where the incident occurred.

Defendant also testified at the hearing. According to defendant, he was intoxicated at the time of the incident. Defendant explained that he had consumed six or seven daiquiris, which contain vodka, before the interview. He began drinking at approximately 12:30 a.m. or 1:00 a.m. on December 26, 2012. Defendant also smoked four or five blunts of "Cush," which he explained is strong marijuana; however, defendant explained that he smoked one blunt and had two daiquiris during the daytime on December 26, 2012. Defendant smoked the other blunts and drank the other daiquiris during the early morning hours of December 26, 2012. Defendant went to sleep on December 26, 2012, at 2:00 a.m. and woke up at approximately noon. Defendant did not remember the police interview at the time of the motion hearing or Officer Maye's asking him, "[D]o you know who this is?" Defendant also explained that on the day of his arrest, the police came to the house. His girlfriend Lida Love, defendant's niece, and defendant's nephew were in the house. Defendant was trying to find something in the closet when he was arrested. Defendant asked the police officers why they came to the house. The police officers told defendant that they had a warrant based on defendant's outstanding traffic tickets.

Defendant's mother, Linda Moore, also testified at the hearing. Moore explained that on December 26, 2012, police officers entered her home without her invitation. She also testified that the officers did not show her an arrest warrant. But Moore also explained that she was not at home at the time of defendant's arrest because she was at work. Defendant was awake when Moore left for work, and defendant had been drinking vodka, gin, and beer the entire day of his arrest. Defendant also smoked approximately two marijuana cigarettes. Moore explained that defendant was intoxicated at the time of his arrest, and she knew this even though she left for work at 8:00 a.m.

The trial court ruled that there was no indication that defendant was intoxicated during the interview with Officer Maye and based its decision on its observations from watching the

---

[2] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

first 20 minutes of the videotaped recording of defendant's interview by Officer Maye. The trial court noted that it had considered defendant's answers to Officer Maye's questions, as well as how defendant gave his answers. The court observed that defendant read and initialed the *Miranda* waiver form. The trial court also noted that defendant appeared to remember certain details of the interrogation while forgetting others. The court also reasoned that defendant had ingested most of the alcohol on the day before he was arrested. The court pointed out that defendant's statement to the police was cogent and that defendant slept several hours on the day of the interview. Finally, the court noted that Moore was not with defendant most of the day and could not have observed whether defendant consumed alcohol. Thus, the court ruled that defendant's statement was voluntary and denied defendant's motion to suppress.

Defendant's waiver of his *Miranda* rights was knowing and intelligent. According to Officer Maye, defendant did not appear to be drunk or tired at the time of the interrogation. Defendant did not slur his speech. His eyes were not bloodshot. Defendant also did not appear confused or disoriented, and he was coherent and was able to understand the conversation. Officer Maye was able to reason with defendant. Although defendant consumed alcohol and marijuana before the interview, defendant consumed most of the marijuana and alcohol in the early morning hours of the day of the interview. Officer Maye read a constitutional rights form to defendant and gave defendant the opportunity to read it himself. Although Moore testified that defendant was intoxicated, she had not been home for the majority of the day of defendant's arrest. Defendant stated at the hearing that he could not remember the interview, but he later stated that he remembered certain details of the interview. From these facts we conclude as did the trial court that defendant knowingly and intelligently waived his rights. *Gipson*, 287 Mich App at 265.

In addition, although defendant does not raise the issue of whether he voluntarily confessed to shooting Wall and also does not discuss in his brief on appeal whether his waiver of his *Miranda* rights was voluntary, we hold that defendant's waiver of his *Miranda* rights and his statement to the police were voluntary based on the totality of the circumstances. See *People v Billings*, 283 Mich App 538, 549; 770 NW2d 893 (2009) (acknowledging this Court's ability to address issues not raised by the appellant on appeal). At the time of the interview, defendant was 29 years old and had completed the ninth grade. Defendant was not deprived of any food or water during the interview. Defendant had a juice carton in his possession at the time of the interview. The scheduled feeding time on that day would have been 6:00 p.m., and defendant was interviewed around 8:00 p.m. Defendant slept for at least eight hours the night before he was interviewed. As discussed above, although defendant testified at the hearing that he had consumed alcohol and marijuana on the day of his police interview, there is no indication that he was intoxicated when he waived his *Miranda* rights and provided a statement to the police. There is no indication that there was a prolonged delay between defendant's arrest and the interview or that the interview was unreasonably long. Thus, the totality of the circumstances surrounding defendant's interview shows that defendant voluntarily waived his *Miranda* rights and gave the statement to the police. See *Cipriano*, 431 Mich at 334; *Ryan*, 295 Mich App at 396-397.

Defendant next argues that there was insufficient evidence to submit the charge of first-degree premeditated murder to the jury and for the jury to convict him of the offense. Defendant also argues that the prosecution failed to prove beyond a reasonable doubt he did not act in self-defense. We disagree.

This Court reviews a claim of insufficient evidence de novo. *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012). This Court reviews the trial evidence in a light most favorable to the prosecution to determine whether it would justify a rational trier of fact in finding that all the elements of the crime were proved beyond a reasonable doubt. *Id*. In conducting this review, we will not interfere with the trier of fact's role in determining the weight of the evidence or assessing the credibility of witnesses. *Id*.

First-degree premeditated murder is defined as "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a). In order to convict a defendant of this crime, the prosecution must prove beyond a reasonable doubt that "'the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate.' " People *v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (citation omitted). To prove the elements of premeditation and deliberation, the prosecution must show that the defendant had sufficient time to take a "second look" regarding his actions. *Id*. The elements of premeditation and deliberation may be established from the circumstantial evidence and reasonable inferences drawn from the evidence presented at trial. *People v Unger*, 278 Mich App 210, 229; 749 NW2d 272 (2008). "Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *Id*.

At common law, self-defense justified the killing of another person if the accused honestly and reasonably believed that his life or the life of another person was in imminent danger or that there was a threat of serious bodily harm. *People v Guajardo*, 300 Mich App 26, 35, n 2; 832 NW2d 409 (2013). The Self-Defense Act (SDA), MCL 780.971 *et seq*., "modified the common law's duty to retreat that was imposed on individuals who were attacked outside their own home or were not subjected to a 'sudden, fierce, and violent" attack.' " *Id*. at 35-36 (citation omitted). The SDA provides that for lawful self-defense an individual must have a legal right to be where he is, must not be engaged in the commission of a crime, and has no duty to retreat. MCL 780.972(1). In addition, once a defendant puts forth some evidence sufficient to support a prima facie defense of self-defense, the prosecution has the burden to exclude the possibility beyond a reasonable doubt that the defendant acted in self-defense. *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010).

We conclude sufficient evidence of premeditation and deliberation justified submitting the charge of first-degree premeditated murder to the jury and for the jury to convict defendant. Lawrence Helzer and defendant had a previous relationship: defendant regularly sold cocaine to Helzer. On the day of the shooting death, defendant and another man confronted Helzer regarding money Helzer allegedly owed defendant. Defendant and his companion assaulted Helzer, knocking him to the ground. Wall came out of the apartment and pulled defendant off Helzer; defendant and his companion began to hit Wall. Helzer retrieved a sword from his apartment, and he and Wall chased defendant and the man with him. Wall and Helzer then went back into their apartment building. Defendant later called Helzer and told him that if he did not

-5-

come outside, he would never be able to go back inside again. Subsequently, Helzer looked out a window and saw defendant riding a bicycle. Defendant was holding what looked like a pistol. Helzer could not see defendant at the moment he heard the first of five gunshots. After the shooting, Helzer looked through the door of the apartment building and saw Wall lying on the ground outside. Helzer testified defendant was no longer present when he found Wall's body.

Karla Nash, who witnessed the shooting, testified the man who did it ran away. Nash saw two men standing outside but did not see anything in either man's hands. She testified that the man who fell to the ground had his hands to his side during the encounter.

According to defendant's statement to the police, defendant retrieved a gun from underneath logs. Defendant went back to the apartment and talked to Helzer on the telephone. Wall came out of the apartment building and started to walk toward defendant. Wall reached "in his back area," which made defendant think that Wall had something in his possession. Defendant shot Wall three or four times because he was defending himself.

There was sufficient evidence for the jury to find that defendant acted with premeditation and deliberation. From the evidence, the jury could find that defendant went to another area, retrieved a gun, shot Wall multiple times, and then fled the scene. See *Jackson*, 292 Mich App at 588. The time period in which defendant retrieved the gun was sufficient for him to take a second look. See *id*. Even if defendant intended to shoot Helzer instead of Wall, the doctrine of transferred intent allows a jury to find that the defendant intended to kill one person but mistakenly or accidentally killed another person. "'It is only necessary that the state of mind exist, not that it be directed at a particular person.'" *People v Lawton*, 196 Mich App 341, 351; 492 NW2d 810 (1992) (citation omitted). Thus, even if defendant intended to kill Helzer instead of Wall, the doctrine of transferred intent allowed the jury to find that the requisite state of mind existed for first-degree premeditated murder. *Id*. at 350-351.

In addition, there was evidence presented at trial to discredit defendant's self-defense claim. On the one hand, defendant claimed in his statement to the police that he acted in self-defense. This is further supported by the fact that Wall had cocaine in his system at the time of his death, which could have caused "euphoria, excitement, restlessness, risk taking, sleep disturbance, and aggression." But there was no other evidence at trial that Wall attacked defendant after the initial physical altercation in the apartment building. Furthermore, Wall had seven gunshot wounds. Six shell casings were recovered from the scene of the incident. This contradicts defendant's claim that he acted in fear for his life. Additionally, there was no evidence that defendant shot Wall at close range. No weapons were found at the scene of the incident near Wall's body or in the hallway of the apartment building. According to Nash, Wall had his hands at his sides during the encounter. This contradicts defendant's statement to the police that Wall was reaching for a weapon. Thus, there was ample evidence to disprove defendant's claim that he honestly and reasonably believed his life was in imminent danger or that there was a threat of serious bodily harm. *Guajardo*, 300 Mich App at 35. To the extent that defendant's statement to the police conflicted with other testimony at trial, we note that it was the jury's role to decide the credibility of witnesses. *Eisen*, 296 Mich App at 331. Consequently, we conclude there was sufficient evidence to submit the charge of first-degree premeditated murder to the jury and for the jury to convict defendant of the offense.

Defendant next argues that defense counsel was ineffective for failing to investigate whether the police officers unlawfully arrested defendant and for failing to challenge the delay in defendant's arraignment on the warrant. We disagree.

A defendant preserves the issue of whether defense counsel was ineffective by moving in the trial court for a new trial or an evidentiary hearing to support his claims. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Defendant did not do so. Our review is therefore limited to mistakes that are apparent on the record. *Id*. An ineffective assistance of counsel claim involves issues of law and issues of fact. *Id*. The trial court's findings of fact, if any, are reviewed for clear error, and the ultimate constitutional claim of ineffective assistance of counsel is reviewed de novo. *Id*.

In order to establish ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). There is a strong presumption that defense counsel's conduct constituted sound trial strategy. *Id*. at 52. It is the duty of defense counsel to reasonably investigate possible defenses or to decide that particular investigations are unnecessary on the basis of reasonable professional judgments. *Id*. Defense counsel's failure to investigate an aspect of the case constitutes ineffective assistance of counsel only if the failure to investigate undermines confidence in the outcome of the trial. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). In contrast, defense counsel is not ineffective for failing to raise a meritless argument or futile objection in the trial court. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defense counsel did not render ineffective assistance. First, defendant fails to establish the factual predicate for his claim that the police officers did not have a warrant to arrest him for the homicide. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Defendant was arrested on December 26, 2012. The felony warrant associated with this case file was signed on December 28, 2012. But during the hearing on defendant's motion to suppress, Officer Maye testified that the officers arrested defendant on an outstanding homicide warrant. There is also a detainee input sheet in connection with defendant's arrest in the lower court record. The detainee input sheet is dated December 26, 2012, and it lists the numeric codes for five different holds or warrants related to defendant's arrest.

Defendant attached to his motion to remand in this Court a Detroit Police Department arrest report. The arrest report is not located in the lower court record; therefore, it is not part of the record on appeal. See *Petri*, 279 Mich App at 410. But even if the arrest report were part of the lower court record, we note that it does not contradict Officer Maye's testimony that the officers had an outstanding homicide warrant for defendant's arrest. The report makes reference to a homicide case and outstanding traffic warrants. In sum, defendant has failed to prove the factual predicate of his claim. *Hoag*, 460 Mich at 6.

-7-

Moreover, even assuming that the police officers only had a warrant for defendant's arrest in connection with his traffic tickets, defendant's claim fails. Our review of the record supports that the police had probable cause to arrest him for homicide even if they did not have an arrest warrant. A police officer may arrest a person without an arrest warrant if the police officer has probable cause to believe that a felony was committed and that the person committed a felony. MCL 764.15(1)(d); *People v Cohen*, 294 Mich App 70, 74; 816 NW2d 474 (2011). Probable cause to arrest exists when the facts and circumstances known by the police on the basis of reasonably trustworthy information are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed. *Id.* at 75. The record supports that the police had gathered sufficient reasonably trustworthy information from their investigation of the shooting of Wall to have probable cause to believe that defendant committed the homicide. For the same reasons, even if the police officers entered his mother's home without valid consent, defendant's arrest was otherwise lawful and did not taint defendant's subsequent voluntary statement after his voluntary, knowing and intelligent waiver of his *Miranda* rights. See e.g., *People v Frazier*, 478 Mich 231, 235; 733 NW2d 713 (2007) (the exclusionary applies only to evidence obtained as a result of police misconduct). And again for the same reasons, defense counsel was not ineffective because a challenge to the arrest would have been futile. See *Ericksen*, 288 Mich App at 201.

Defendant also argues that defense counsel was ineffective when he failed to interview Moore and Love. Defendant argues that Moore would have testified at a hearing that she was not at home at the time of defendant's arrest; defendant was a guest in her home, and she did not consent to allowing the police to enter her home. Moore, however, provided this testimony during the hearing on defendant's motion to suppress his statement to the police. Defendant also argues that Love would have provided testimony establishing that the police officers arrived at the home, searched through the home, did not receive Moore's consent to enter the home, and told Love that they had several arrest warrants for defendant's arrest. But defendant fails to establish any factual support for his argument that Love would have provided favorable testimony. See *Hoag*, 460 Mich at 6.

Defense counsel also did not render ineffective assistance for failing to challenge the delay between defendant's arrest and his arraignment because defendant's statement was not obtained as a result of the delay. In general, under the Fourth Amendment's promptness requirement, the police may only detain a person arrested without a warrant for more than 48 hours without an arraignment if they are able to "'demonstrate the existence of a bona fide emergency or other extraordinary circumstance' that would justify the delay." *People v Whitehead*, 238 Mich App 1, 2; 604 NW2d 737 (1999) (citation omitted). When there is an improper delay, the remedy is the suppression of evidence obtained as a result of the improper delay. *People v Mallory*, 421 Mich 229, 240; 365 NW2d 673 (1984). In *People v Cain*, 299 Mich App 27, 49-50; 829 NW2d 37 (2012), vacated in part on other grounds 495 Mich 874 (2013), this Court held that, although the defendant was arraigned more than 48 hours after his arrest, the trial court did not err in failing to suppress the defendant's statements to the police on the day of his arrest because the statements were not obtained as a result of the improper delay.

Although more than 48 hours elapsed between defendant's arrest and his arraignment on the charges in this case, Officer Maye interviewed defendant on the evening of his arrest. Thus, defendant's statement to the police was not obtained as a result of undue delay in being

arraigned. See *Cain*, 299 Mich App at 49-50. Defendant otherwise fails to show how he was prejudiced as a result of the delay. Therefore, defense counsel was not ineffective for failing to challenge admission of the statement based on the delay between defendant's arrest and arraignment since the challenge would have been unavailing. *Ericksen*, 288 Mich App at 201.

We affirm.

/s/ Jane E. Markey
/s/ Christopher M. Murray
/s/ Stephen L. Borrello